[No. 9718. Department Two. November 25, 1911.]

JOSEPH BRINTON, *Appellant*, v. LEWIS-LITTLEFIELD
COMPANY *et al.*, *Respondents.*[1]

TRUSTS—DECLARATION OF TRUST—CONSTRUCTION—POWERS OF TRUSTEE. A declaration of trust to hold, manage or sell lands purchased for speculation, and subject to a mortgage, at such time and price and on such terms as shall to the trustee seem best for the interests of the subscribers, authorizes the trustee to deed the same to the mortgagee to save the costs of foreclosure, and preserving the equity of redemption for two years by an option to repurchase, where it became impossible to effect a sale or obtain from the subscribers the balance of the purchase price or pay off the mortgage, and the interests of the subscribers were best protected by such course.

TRUSTS — ACTION TO DECLARE TRUST — RIGHTS OF PLAINTIFF — EQUITY. A mortgagee to whom a trustee had deeded the property, cannot be declared a trustee of the interest of a subscriber to the fund to purchase the property, where the subscriber refused to pay

[1]Reported in 118 Pac. 917.

his part of the balance of the purchase price secured by the mortgage, or to reimburse the mortgagee for taxes and expenses incurred; since he who seeks equity must first do equity.

Appeal from a judgment of the superior court for King county, Tallman, J., entered February 3, 1911, in favor of the defendants, after a hearing before the court, dismissing an action for equitable relief. Affirmed.

*E. W. Howell*, for appellant.

*Leander T. Turner* and *Sandford C. Rose*, for respondents.

MORRIS, J.—It is sought in this action to follow trust funds into the hands of a third party, and to obtain a decree holding such third party to be a trustee for the benefit of plaintiff. The court below dismissed the cause, and this appeal follows.

The facts are these: The Lewis-Littlefield Company was, at the time of the involved transaction, engaged in the real estate business at Seattle. On February 13, 1907, the company received from appellant $650 to invest in real estate for the use and benefit of appellant, and gave him its acknowledgment as follows:

"Received of Joseph Brinton $650 for investment in real estate. It is understood that the money is to be invested as soon as possible, and that as soon as so invested, a complete statement and declaration of trust is to be furnished. It is also understood that as soon as the property is sold, the whole or any part of this money, together with the profits, may be withdrawn by the subscribers.

                    "Lewis-Littlefield Co.,
                        "By Geo. B. Littlefield, Manager."

On February 16, Lewis-Littlefield Company purchased from respondents Black, lot 7, block 9, Rainier Boulevard Fourth addition to Seattle, for the sum of $4,000, taking the title in its own name. Of this amount $1,350 was paid in cash, and the balance was represented by a promissory note payable in one and two years and secured by a mortgage on

the lot.  On February 27, Lewis-Littlefield Company, in pursuance of its agreement expressed in its receipt of February 13, executed and delivered to appellant the following declaration of trust:

"This is to certify that Lewis-Littlefield Co., a corporation of Seattle, Washington (herinafter called the company), has received from Joseph Brinton of Seattle, (hereinafter called the subscriber), for investment in property for sale by said company as brokers or owners, the sum of six hundred and fifty and no-100 dollars ($650), and that the same has been expended, together with other similar sums, in the purchase of lot 7, block 9, Rainier Boulevard Fourth addition to the city of Seattle, at the price of four thousand dollars ($4,000) and upon the following terms:  One thousand three hundred and fifty and no-100 dollars ($1,350) cash, balance, one and two years at 7 per cent per annum.  There has been subscribed for the purchase of this property the sum of one thousand three hundred and fifty and no-100 dollars ($1,350), which has been or is to be expended as follows:  Cash payment, .. $1,350.  Property to be sold before one year.  This property is held by the company in trust for the subscriber and for other subscribers to the fund, upon the following terms:  The property is to be held and managed by the company for the benefit of the subscribers, the said company retaining the exclusive right to sell such property at such time, at such price and on such terms as to said company shall seem best for the interest of the subscribers.  If, at any time, it shall seem necessary to make any further payments for the protection of the interests of the subscribers, the company shall have the right at their option to make such payments, and to receive repayment of same with interest at the rate of eight per cent per annum, from the first proceeds of the sale of the property.  When the property is sold, the proceeds shall be applied as follows:  1st, To the payment of the expenses of the sale, including a commission of 5 per cent to Lewis-Littlefield Co.; and, 2nd, to the repayment of such sum or sums, in excess of the original subscriptions as may have been applied to the payment of taxes, special assessments or other expenses necessarily incurred in protecting the interest of the subscribers, with interest at the rate of eight per cent per annum from the date of such payment or payments to the date of the sale

of the property. 3d. The surplus remaining after payment of the foregoing sums shall be distributed *pro rata* to the subscribers, the amount due the holder of this certificate being 650-1350 of the entire net proceeds.

"In witness whereof the company has caused this certificate to be signed and its corporate seal to be affixed by its manager, thereunto authorized, this 21st day of February, 1907.                    Lewis-Littlefield Co.,

"(Corporate Seal.)       By Geo. B. Littlefield, Manager."

The cash payment of $1,350 is conceded to be made of the $650 paid in by appellant and $700 paid in by other parties, under the same arrangement. On March 28, 1908, appellant paid to Lewis-Littlefield Company the further sum of $65, which, with other sums paid in by other subscribers, was used in making a partial payment of interest then due on the note and mortgage. At the time of the purchase of the lot from Black, the real estate market was active, especially in the neighborhood of this lot, where, on account of certain regrades of streets connecting with the down-town portion of the city, it was assumed property in this vicinity would be brought into closer touch with the business district of the city and its value greatly increased. It is apparent that this was in the minds of the subscribers to this trust fund at the time, and that they expected to make a resale of the lot before any additional payments were required, at such an increase over its cost as to give them a handsome profit on their investment. Unfortunately, like other "best laid plans," this expectation was never realized. The year 1907 saw many business reverses. Times became hard, money scarce, and investments of every nature, made on the expectation of "quick sales and ready profits," returned only disappointment and withered hopes. This is shown to be especially true of real estate values in the vicinity of this lot. Lewis-Littlefield Company made strenuous efforts to sell, but was unable to do so. Street assessments, taxes, interest, and the first payment on the note became due, and these investors found themselves with an unsalable lot on

their hands, and were either unable or unwilling to make further advances to protect their interest in the property. The record shows that Lewis-Littlefield Company kept appellant fully informed of the situation, but with the exception of the $65 paid by him for the purpose of meeting the first interest payment, he was not in a financial situation to respond to the demands made upon him for his share of the required payments. This was the situation when the note and mortgage became due and payment was demanded by Black.

After some deliberation between Lewis-Littlefield Company and Black as to the best way to protect all the interests in the lot, it was decided, in order to save the cost of a foreclosure of the mortgage, to give Black a deed to the lot. This was done on August 6, 1908, six months after the mortgage by its terms could have been foreclosed, and after Black, in order to protect his mortgage, had paid a street assessment of $225, taxes for 1907, and the first half of the 1908 taxes. This deed to Black was made under an arrangement that, if the balance of the interest on the principal sum should be paid on or before August 20, 1908, the deed should be returned and the mortgage extended to mature February 16, 1910. Lewis-Littlefield Company endeavored to raise the necessary amount from the subscribers to meet these interest payments, but was unable to do so, and it was then agreed that Black would give the company an option to purchase the property for $2,650, in addition to the amount paid for taxes and accrued interest, the option to expire September 1, 1909. After obtaining this option, Lewis-Littlefield Company continued its efforts, both to obtain a sale of the lot and to collect from the subscribers sufficient money to take up the option. Neither effort was successful. By arrangement between Lewis-Littlefield Company and Black, this option, which by its terms expired September 1, 1909, was extended until some time in August, 1910,

thus giving the members of the purchasing syndicate nearly two years in which to redeem the property.

We have gone thus fully into the facts shown by the record in order to show the situation developed by the evidence under which appellant claims he is entitled to equitable relief. His first contention is that, under its trust declaration, the Lewis-Littlefield Company had no power to convey the property to Black, in order to avoid a foreclosure of the mortgage, and that the sale authorized in the declaration of trust was only such a sale as was contemplated by the parties at the time the trust agreement was entered into; that is, a sale to some third party for a consideration to be paid for the benefit of the members of the syndicate. Equity has regard for the substance rather than the form. The authority to sell conferred upon the Lewis-Littlefield Company was one that should be made to secure the best interests of the subscribers to the trust fund. It is doubtless true that, at the time the declaration was made, all parties contemplated a sale for profit, without additional expense. The exigencies of the time made this impossible. What they contemplated failed, and a new condition confronted them, in which Lewis-Littlefield Company must act so as to conserve and preserve the best interests of the trust. In this unforeseen emergency, Lewis-Littlefield Company acted as to it seemed best for the interest of its subscribers. It saved the costs of a foreclosure of the mortgage, while at the same time preserving the right of the subscribers to obtain the property and protect their initial payments for a period of nearly two years after they had lost their interest in the property through their default.

Appellant must concede the right of Black to foreclose the mortgage. What would it benefit appellant, and those in a like situation, if he had done so? To the amounts due under the mortgage, would have been added the cost of the foreclosure, including attorney's fees and the added charges upon the land by way of taxes and assessments. Conceding the statutory redemption from the sale under the foreclosure

decree, appellant and his associates would have had a greater sum to pay within one year than the amount fixed by Black, and for which payment they were given nearly two years. In construing that clause in the declaration, a court of equity will not limit itself to what appellant considered to be for his best interest in the sale of the property, but will look to all the circumstances surrounding the sale at the time it was made, to determine what would, in the language of the declaration, amount to a sale of the property "at such time, at such price, and on such terms as shall seem best for the interest of the subscribers." It seems to us there is but one answer to such a question, and that, the arrangement which gave these subscribers the greater time for the less price. The case is not unlike that of *Sprague v. Betz*, 44 Wash. 650, 87 Pac. 916, where it was held that trustees under a will, with power to sell but not to mortgage, having given a mortgage upon the trust estate, could subsequently convey the property to the mortgagee, notwithstanding the invalidity of the mortgage, under an agreement for the satisfaction of the debt, with right of redemption reserved to the beneficiaries within three years.

Appellant's main reliance is upon a rule laid down in *Russell v. Russell*, 36 N. Y. 581, 93 Am. Dec. 540, that a power vested in the executrix of a will to sell real estate "as she may deem most expedient and for the best interest of all of my said legatees," is not well executed by the conveyance to one of the legatees of a portion of the real estate of the testator in payment of a debt due from the testator to the legatee. The reasoning of the court makes that case of no value to appellant. It is based upon the lack of power or control in the executrix over the real estate. There was personal property enough for the payment of the testator's debts without calling upon the real estate, and the real estate was not liable for the payment of debts until the personal had been exhausted, and that inasmuch as the discharge of the testator's obligation was a duty resting upon the

executrix, and she had ample funds with which to discharge it, she could not avoid the duty as executrix and seek to meet the obligation under the general power of trust in which the payment of debts was no part of the trustee's duty. Besides, the court is there dealing with a power which must be legally exercised, under its strict terms. Here we are dealing with a power to be equitably exercised, and to be interpreted by reference to well known principles of equity.

Neither do we think the record shows that, while seeking equity, appellant was willing to do equity. He sought in his complaint to be adjudged the owner of an undivided 715-4000 interest in the land, upon the theory that the price of the land to the syndicate was $4,000, and that he had paid in altogether $715. Subsequent to the sale to the syndicate, an indebtedness had accumulated against the land in taxes, local assessments, and interest due on the note and mortgage, which had increased the amount due Black from $2,650, the amount of the deferred payments at the time of the purchase by the syndicate, to approximately $3,500. These taxes and local assessments had been paid by Black. Yet appellant prays for an interest in the land which charges these items of interest, taxes, and local assessments against the interest which Black would retain. There is no equity in such a prayer, and no court of equity would grant it. Black, on the other hand, while asserting an absolute ownership in the lot under the deed from Lewis-Littlefield Company, made an offer in his answer to convey the property, if within thirty days the appellant would pay the amount due on the original purchase, together with these additional charges against the land, which would make the price of the land under this offer approximately $3,500. This was an offer to do equity, as we view it, which appellant was not willing to accept. Appellant, upon the trial, offered testimony that the value of the land was at that time, as fixed by one of his witnesses, $4,000. Another gave it as $4,500. If appellant believed this was the true value of the land, and we as-

sume he did since he sought to prove it, an acceptance of Black's offer to convey at a price which would make him whole on the transaction, which was $3,190.26, plus interest and taxes since paid, and which was approximated at the time of the trial at $3,500, was all that appellant could ask a court of equity to do and have any regard for other equitable interests in the property.

Upon the whole case, we can see no equity in appellant's prayer, and the judgment is affirmed.

DUNBAR, C. J., ELLIS, and CROW, JJ., concur.